My name is Robert Ruyak. On behalf of the appellants in this case, we're going to split our time. I will take the first ten minutes. My colleague, Hillary Potashner, will then argue and we'll reserve two minutes for rebuttal. I'm going to address the issues of VORDAR, the customs fraud and wire fraud issues in this case. I want to state that the single most important issue for this court to resolve an appeal is a judge's abuse of discretion in failing to ask questions of VORDAR designed to root out Asian and Chinese bias, which we believe violated the appellant's Sixth and Fifth Amendment rights to a fair trial. We believe this trial was compromised in the very beginning because of that. The Supreme Court's standards are clear that when there is a significant likelihood that racial prejudice may affect the jury trial, then it's constitutionally required to ask those questions. That's Restano. Again, in Rosales-Lopez, where there are substantial indications of the likelihood of racial ethnic prejudice affecting the jurors, they are required constitutionally. So why was there a substantial likelihood here? You have six U.S. companies as defendants and there are allegations about a conspiracy involving Chinese nationals and companies, but what puts us in the line where something more specific has to be done? Because in this particular case, we have to know where we were at that time, and we all know where we were. The day the trial started, more than 600,000 Americans already died of this disease. Millions more were sick and injured. Nearly every American knew of someone who was sick or injured or died. We were shut down in our homes. Many people lost their jobs. The officials, including the President of the United States, called it the Chinese virus. There was xenophobia raging all over the country, and even Congress had to pass a law. Every case that's intentionally connected to China needed specific voir dire instructions? No, Your Honor. So what makes this case different? This case is different because in this particular case, at that point in time, our U.S. clients were clearly owned by Chinese nationals and Chinese Americans. That was clear. And the allegation was that we're in a conspiracy with a mainland China company, a massive company, $14 billion company, owned by mainland Chinese, and they were the perpetrators of this conspiracy. The government used that to define that this was a China versus U.S. This is what they used, China versus U.S., and maybe that was the case. But this particular bias clearly existed in the general population. So what questions should the jury – should the judge have asked? I looked at your proposed instructions that were – the proposed questions that were given to the judge. Two are related to COVID-19, numbers 24 and 25. That's right, and of course – So if he would have given those – if he would have asked those two instructions, you would have said, ah, perfect, he did his job. No, Your Honor, because what would have happened is if someone believed that the COVID virus was a Chinese virus, and if they were responsible for the lockdown, we would have had the opportunity when those jurors raised their hand to ask questions in private in front of the judge. That's how it works, and we could have asked. Did this judge inform counsel that they were going to be allowed to ask Vordaer questions? No, but he did – Because I understood from the record here that he was going to do the Vordaer. True, except one. In the central district, that's basically the way it's done. Except, Your Honor, when a juror raises their hand that shows a bias, we would go up in front of the judge in private and go further Vordaer of that particular juror. That's how it works. So my understanding is – well, not my understanding. This is the way I would – I'd tell counsel when I was a district judge, look, I'm going to do the questioning. You can submit questions to me. I'll take a look at them if I think they're appropriate. I'll ask them. If I don't think so, I'm not going to ask them. Well, yes, Your Honor. I mean, I don't understand where the judge went wrong here. He certainly went wrong because in this environment we were in, we were standing there with masks and plexiglass, Chinese viruses all over the place. The general population was – there was bias, and we're not saying it's wrong for them to be biased. They lost loved ones, and you're sitting here accusing our clients of a conspiracy with a Chinese company. Let me ask you this. Are you saying at rock bottom these defendants could not have gotten a fair trial during this particular time? They could have if we had unbiased jurors, if we had the opportunity to ask them, are you blaming the Chinese for this virus that may have killed one of your loved ones? This was a very unique situation. What indication do you have that any juror actually harbored any bias? Because of the results of the case. Because of the results of the case. This jury was out a very short period of time on multiple claims, and they came back right down the line for the government every one. Let's take and let's get into the customs fraud. The government admitted that there was no intent to violate the customs laws. They've admitted it on appeal now. But the jury disregarded all of that. Even though the government switched their theories in the middle of the case, they just went with the government on those and every other claim. Even the wire fraud was just totally an exterritorial issue. It had nothing to do with the United States. The jury went with them on that claim. I think that shows that this jury, some members of this jury, and together there was the potential for bias. And I think, Your Honor, I've practiced a long time. Maybe I'm the oldest person in this courtroom. I doubt it. Three quarters of a century. Three quarters of a century old I am.  Maybe you beat me a couple years. But I've never seen anything quite like this. I must say, why wouldn't the judge ask those questions when in the midst of this when you know every witness was Chinese? Everyone. The credibility issues. Would they accept the credibility of the Chinese witnesses? The court did ask general bias questions, didn't it? Yes, Your Honor. So why wouldn't that have gotten to it? Because the Supreme Court has ruled that in Rodriguez v. Colorado, that you can't just do that when you have very specific biases like this. Look, we all know where we were then. Right in the middle of this pandemic. We know that the general population was biased maybe for good reasons, but why couldn't we have the opportunity to see that that occurred with these jurors? Let me ask you this. Now, I haven't read the entire transcript. I looked at the parts of it that were raised on appeal. But I gather when the jury came in, when the panel came in, the judge explained to the possible jurors what the case was about, correct? Yes, in general terms, yes. In general terms. Because, you know, it's about Chinese companies and, you know, customs fraud and whatnot, wire fraud.  And at any point along the way, did he ask the jurors whether they could be fair and impartial? Is there anything about the case that would prevent you from being fair and impartial? Well, yes, a general question. But, my God, in a situation where there's – and the Supreme Court has said, look, the standards are pretty clear, I think. And I refer to those three cases I mentioned because they set the standard. If you consider the ways it's directly bound up in the conduct of the trial. It was bound up in the conduct of the trial at this point. This was not a normal situation. This was the most unusual situation in my lifetime. And we know Congress even had to pass a law because people in this city, Asian Americans, have been accosted in the streets. Now, if you have that and you're trying to get a jury to come into this courtroom and be unbiased, you at least have to ask those questions and give me the opportunity, which I didn't have in this trial, to challenge them. Any individual defendants in the courtroom? Individual defendants? Yes. No, these were corporations. They're all corporations. Counsel, you said that the government had conceded there was no customs fraud on appeal. Yes, Your Honor. Where did they do that? They did it on pages 14 and 15 of their second brief and on page 78. Because what they said there was changing their story from the story they had in their indictment. In their indictment, they said they brought what happened was these extrusions were excluded. They took extrusions, put them in the form, temporarily in the form of a pallet, brought them in to disassemble and sell in the United States as extrusions. That's not what happened in trial because they couldn't prove it. They failed. Even their own experts said, no, that's not what happened. So now they changed their theory to, well, they brought them in for the purpose of melting them down as raw material in the United States, which carries no customs duty. That's the case. That's your support for the comment that they conceded there was no customs fraud on appeal? That's right. Okay. Because if you look at U.S. v. Davis, which is the case that we have to rely upon for the customs fraud, there's three elements. Importation, contrary to law, and the defendant knowingly imported these contrary to law. They said in their indictment that the intent was to bring them in, disassemble them, and sell them in competition with U.S. products. At the trial, they said, no, that was not it because they couldn't prove that. So now they're saying they brought them in to melt them down as raw material. That does not transgress the customs laws. There is no duty, if it's raw material, and only a 2.5 percent duty if you bring in a product to melt it down to reuse it. The key is that the anti-dumping, countervailing duties are to protect U.S. competition in the sale of a similar product. So there was no law here that the defendants violated? They did not. They didn't violate anything. They did not because the basic premise is that the anti-dumping orders apply to products being brought in and sold in commerce, and so the only intent here that the government alleged was intent not to pay the appropriate duty. That's what this case is about. This wasn't contraband. You could bring these things in all you wanted. You just have to pay the anti-dumping duty. So you're cutting into your co-counsel's time at this point. Okay. Thank you, Your Honor. Thank you, Your Honor. Hillary Taster, may it please the Court. Your Honors, I'm going to turn to three different issues, and I'll leave that issue behind for a moment. The three things that I'd like to address are the restitution order, the jury instructions, and if we have enough time, the hearsay issues, which I think infected the entire trial. Let me start with the restitution. If this Court finds that there was a customs fraud violation or multiple violations, which we do not believe this Court should, but if it does, then there's no issue in terms of the amount of restitution. We will concede that if there's a customs fraud violation. Our position is there is no customs fraud violation because at the time of the importation, our clients did not have the intent to evade. They had the intent to comply with the ADCVD orders, but not to evade. Setting that aside for a moment, if the conviction stands and if the conspiracy conviction stands, no issue in terms of the total amount. However, the government is now requesting that this Court abandon and disregard the Court's decision in terms of the restitution payment schedule. As this Court is well aware, it is within the trial court's discretion to set that schedule, and this Court should only disturb that schedule if it finds that the trial court abused its discretion in setting the schedule. It seems like it may have because there's nothing that suggests to me that the Court made a finding as to the defendant's ability to pay, and there was a dispute before sentencing as to what the value of the warehouses were and other things that the district court did not resolve. So why isn't that an abuse of discretion in setting the scheduling order? There was no dispute with respect to the revenue coming in, the income coming in, the bank accounts or lack thereof. In terms of the operating costs, there was absolutely no dispute. There was information in the PSR, in all of the PSRs, that both sides had the ability to object to. The government did not object to any of that information. But I understand the government had a different view as to the value of the warehouses and of the value of the excess aluminum pallets that were in other places that had not been seized, and that that affected their ability to pay the restitution schedule as opposed to giving them a nominal payment schedule. So if the Court doesn't make any findings with regard to those disputed issues, it seems to me that would be an abuse of discretion. Tell me why that's not the case. Thank you, Your Honor, and I would disagree that it's an abuse of discretion, and here's why. There was no dispute as to whether or not those warehouses were valuable. There was absolutely no dispute. They were worth $50 million each, or the government's estimations were higher, but they were worth a substantial amount of money regardless of which value the Court adopted. The Court nonetheless made the decision, and it's clear from the Court's actions and what was before the Court, that the Court was not going to force the immediate liquidation of those warehouses. The Court had that ability. The government was asking for that, and the Court did not do it. So whether each individual warehouse was worth $50 million or $500 million, that's a distinction without a real difference. The Court made the decision based on the information before it that it was not going to force the immediate liquidation of those warehouses. But even if that were the case, wouldn't that present a problem if the Court makes a finding that defendants are unable to pay and there's nothing in the record to support it? There is substantial information in the record to support it absent forcing the immediate sales of those warehouses, in which this Court, in many, many cases, has accepted that a defendant need not liquidate their entire assets in order to pay a restitution order. What about the other aluminum pallets that separate the warehouses? I think the government said there were some $800 million to $900 million worth of other aluminum pallets in defendant's control. The Court found that there were $60 million worth of pallets, and the Court did order that those pallets be forfeited and then used for restitution in this case. There was no information put in front of the Court that the warehouses were in possession of any pallets or any aluminum. There was just absolutely an absence of information with respect to the warehouse defendants. Now, I know we are representing six different entities, but I'm focusing on the warehouse entities and whether or not the Court abused its discretion in not forcing the warehouse defendants to liquidate their warehouses. And in this case, it is important to note that there was extensive briefing prior to sentencing in terms of the restitution issue. We filed papers. We filed objections. The government filed objections. The government supplemented their objections. It was quite clear to the Court that there was an issue. It was quite clear to the Court through the entire trial that there were valuable warehouses at issue and in the possession of the warehouse defendants. The Court had all of that information. The Court had the multiple PSRs. The Court had probation's recommendation to either order immediate payment or order a payment schedule, which, by the way, was 10% of the gross revenue or $100 per month, whichever was greater. So the Court did not order just $100 a month. The Court ordered, frankly, probation to monitor the revenue. Should the revenue change, then probation would be well within its discretion to bring it back to Court and say, Your Honor, the revenue has now increased. These warehouse defendants now have substantial revenue or some revenue that should be paid on a monthly basis. This Court set a restitution schedule that is quite consistent with many schedules that are set in a central district. The central district or any court is not required to order immediate payment and to order immediate liquidation of all assets. That is within the Court's discretion. Should the Court want to, but that is not required. Therefore, it's not an abuse of discretion for the Court, after listening to all the testimony for nine days, reading the briefing that went back and forth and back and forth, looking at the PSR, which, by the way, the government did supplement the information that went into the PSR in terms of revenue and money coming into the warehouse companies by providing the parent company's tax returns to probation. With all that information, armed with all that information, the Court made the determination that the Court made. It was not an abuse of discretion to make that decision. It was a measured decision based on all of the information in front of the Court. Did you want to reserve any time for rebuttal? Yes, Your Honor. Thank you. Good morning, Your Honors. May it please the Court. Roger Shea for the United States. I'm going to address all the non-restitution arguments and plan to spend about 15 minutes before turning it over to my colleague, AUSA Patrick Fitzgerald. I'll start with the Vaudier customs fraud argument that Mr. Rujak addressed and then any other questions Your Honors have. The District Court did not commit plain error in conducting Vaudier. The case we cited, Blossvern, noted that the defendant must put forth reasons for particular questions that he or she deems essential. In Blossvern, that defendant submitted 18 questions and after conviction challenged five of them. Here at 5 ER 995 to 98, defendants proposed 40 questions, including subparts, prior to trial. And they did not put forth any specific reasons as to why these particular questions needed to ask. These topics range from prior service, practical considerations, burden beyond a reasonable doubt, and questions regarding climate change and are corporations too powerful. As Your Honors have noted, courts have ample discretion in conducting Vaudier and under Rosales Lopez, racial issues were not inextricably bound with the trial and substantial indications of likelihood. So what do you make of counsel's argument that in the period of time in which the trial took place, there needed to be some special care and attention paid to Chinese-related cases? We certainly were in special time, Your Honor, but what the Supreme Court has shown in all these cases is counsel's raised these specific issues before the district court. The district court is conducting Vaudier with the information it knows at the time. At the appellate level, they're submitting a request for judicial notice years after the conviction. They should have done that and flagged specific questions for the court and the reasons so the government could have considered them, the court could consider them. We'll note... In timing, when were these questions submitted to the district court? I believe a week or so before trial. The court ordered us to file joint proposed jury instructions. And questions. Yes, excuse me, questions. And in all the Supreme Court cases, whether the Supreme Court found the district court abused its discretion, all these counsel raised specific questions with the court. Rosales Lopez requests for specific questions and there was a sidebar. Ressantanio, a written motion and there was argument. And Ham, the defense counsel raised four specific questions and there the court found questions were necessary because a black defendant alleged that he was framed in retaliation for advocating for his own civil rights. And as your honors have noted before, just for your citations, the court did note that this was a case to inflate the value of a Chinese company and exports to the United States and noted it as customs fraud of 1.8 billion. That's ER 1420. Also asked questions, can you be fair at both sides? That's at 1444. And be objective about the evidence and the law. Also at 1444. Gave instructions that you must follow the law and not be influenced by personal prejudices at 1502. And I think before closing, not be influenced by race, national ancestry. Was there any discussion about these questions with the judge? I don't remember there being one. No, so at sidebar, defense counsel said there's some other questions and the judge said to the extent they've been proposed, they have been considered. And the appellants in the reply brief at 11 note 6 quote the court stating that he's not going to entertain objections. But if you look at that full quote, that's in the context of hearsay evidentiary objections and said you will not argue the law before the jury. We were at sidebar doing preemptory challenges, so counsel certainly could have pushed that issue. And they raised no issues until after court, citing things about COVID, things of that nature. And again, the PowerPoint, we provided that, the opening with the pictogram of China to defense counsel prior to trial. In our opening statement, they made no objection there. It was Zong Tianlu himself who described himself as an emperor. And to correct the record, appellants reply brief at 12, they cite numerous times where the government purportedly brings up these terms. But in fact, at 1629, 9 to 10, it's defense counsel's cross-examination using the repeating one of those terms. So let me ask you this, moving on. So did the government change its theory of the case to the extent that it effectively, with the evidence presented, constructively amended the indictment? Not at all, Your Honor. There is no substantial alter or facts distinctly different. The indictment alleged a complex wire fraud, and I'll focus on the customs fraud scheme because that is what is being challenged here. The indictment alleged, I think at ER 1357 to 58, that defendants, as part of their customs fraud scheme, after the 80CVD duties came out, willfully and intended to defraud the 18 U.S.C. 545 by marking that these pallets were finished merchandise when they, in fact, knew they were not. Defense cited this language. I believe they kind of lash on this language in the 80CVD orders and in the indictment that, quote, is fully assembled, and they have lashed on to that to show that the government must have shown that these extrusions were pulled apart. But that's not an element of the crime, and we alleged simply in the indictment that defendants willfully intended to evade the customs law. And that's what we did, and that was the proof that was shown at trial. There's substantial proof at trial shown that one of the co-conspirators, Eric Shen, knew that these were not finished merchandise. He told the ringleader of the conspiracy, Zhang Tianlu, that these were not finished merchandise. There's witness testimony that out of 2.2 million pallets that were sold or, excuse me, exported from China to the United States, not a single one was sold. There's witness testimony from an employee of Perfectus that she sent Johnson Xiao, one of the co-conspirators, an email, this is why we're not selling any pallets. They're too expensive. Here's a plastic one for $13.58, and they still didn't sell any. The lies to CBP, there's testimony that they melted 100,000 pounds. To correct something in appellant's brief, also there is ample testimony that the pallets, we did not need to prove this, appellants admit at their opening brief at 59, the offense is complete at the time of importation, that these pallets and scrap could be remelted into billet and then excrusions. That's at ER 1680. While the government doesn't need to prove that, they certainly showed that there's an intent to fraud CBP. So, Vaudier customs fraud, I'll briefly address. If your honors have any other questions, I will address them, or I can briefly touch upon some of the jury instructions or co-conspirator statements. I guess I have a question about the extraterritoriality argument. I take it your argument is because these were domestic wires that occurred out of the central district of California, we are not dealing with an extraterritoriality issue. And I take it the government's position is whether or not victims might be foreign or domestic, that's enough to be included within the scope of the wire fraud statute? That's correct, your honor. So, as we know in our briefing, Hussain begins and ends the analysis. It's a domestic application of wire fraud statute here. All nine wires charged against the defendants are either emails coming into or out of the central district of California, or wires, I believe, payments going from the central district of California to China or Hong Kong. And the merely incidental test that has not been adopted by the Ninth Circuit does not need to be adopted. And in those cases, even if this court was considering, those both involve foreign defendants and foreign victims. Here again, we have domestic defendants. They're all six U.S.-based corporations, and we put in the record at SCR 32 to 36, there are U.S. victims including Fidelity, Geode Capital, which I believe is in Boston, and Vanguard. And the indictment alleges a stock posted on the Hong Kong Stock Exchange, which is actually global and available to investors around the world. So for these reasons, the voir dire was not plain error or even an abuse of discretion, and the customs fraud was properly alleged. I'll note for the record just on some of the co-conspirator statements that the government cited castaneda. You can use a party opponent statement as independent evidence of a co-conspirator statement. And I'll note we try to look at appellants' brief. They challenge what appears to be at their opening brief, note 22, 23, 35 exhibits and days of testimony. Going through the government's closing PowerPoint, 2 ER 240 to 367, out of the 57-plus exhibits, only appears that eight of those are challenged. And the trial court who sat on day five of trial noted that Zongtian Liu's noted, there's no question he's a co-conspirator on this, on the evidence we've heard so far. That's at ER 2310. And all these folks could also be considered party opponents. Johnson Hsiao was CEO of Perfectus from 2008 to 2014. Eric Shen was the CEO of the warehouse. Zongtian Liu, there was uncontroverted testimony that he's the beneficial owner of the warehouses. There was no objection to Shen's testimony before that. Zongtian Liu was the CEO of Scuderia, and at Perfectus at some point, and Aluminum Caste. And Zijie Wang was the CEO of Scuderia in 2013, and later the warehouse defendants. There are four different individuals that authenticated Johnson Hsiao's email address. Mark Lee at ER 1903 said Hsiao would send him wiring instructions for pallets. Bill Riley, a sales manager at 1574, asked Hsiao if Zongtian Liu would approve a large purchase. Kim Wen in 1987 told Johnson Hsiao were too expensive. Plastic pallets that I mentioned before sell for $18.75. And Christian Robles at 1847, Hsiao instructed him to create pallet orders so there were no actual real orders for these pallets. And I believe that last email at 1847 was the only one that I saw that's actually challenged on appeal. There's also significant independent evidence. There's uncontroverted witness testimony that Zongtian Liu owned both Perfectus and China Zongwang. A picture at SCR 144 of Zongwang and PCA being in the same building were a sign. There's testimony that the entire Zongtian Liu family would conduct audits twice a year at each warehouse. That's at 2197-98. Uncontroverted financial documents that showed a $200 million loan was not a real loan. And if you look at SCR 331-32, these are two Perfectus operation reports from years 2015 and 2016. These are telling, and the government highlighted them in closing. That showed the exact same amount of loan, $1.283 billion, to the exact same $0.09 from one year to the other. To show that Perfectus was getting the money from China Zongwang and it was not an actual loan. They just kept it on the books as loan. And you'll look, their sales in 2015 on that report in SCR 331 was only $136,000 in sale, and the following year was $0. Unless there are any other questions about any other non-restitution issues, I will turn it over to my colleague, Patrick Ficciaro. No other questions. Thank you. Good morning, and may it please the Court. It is certainly true that the district court had wide discretion to set a payment schedule for the restitution. Nonetheless, under this court's authority, for example, in NOVAC and under the text of the MVRA itself, it did need to consider all of the assets of the defendant. And in setting a restitution schedule, the district court could not abuse its discretion. It could not come up with a schedule that was implausible, illogical, or not supported in the record. Well, counsel, I want you to respond to counsel's argument that if the court was not planning to order liquidation of the warehouses, did it then need to consider the proper value of the warehouses themselves for restitution purposes? Yes, Your Honor. At some point, all of the assets of these defendants needed to be considered for restitution, and essentially it would be an abuse of discretion. It would be clear error for the district court to say that hundreds of millions of dollars are not available for restitution when, in fact, the MVRA requires them to be considered and to be made available for restitution. Again, if it's a matter of months, that's one thing. 375,000 years is quite another matter. And ultimately, of course, what matters is that customs get reimbursed. The government does not have the ability and, frankly, from a restitution standpoint is not interested in how it gets the money. The defendants, they can obviously liquidate their assets. They can get an infusion of capital. They can perhaps get another mortgage. But ultimately, they do have to pay over a reasonable amount of money in a reasonable amount of time. Did the district court order them to take specific action? Just to say, you know, you've got to pay $10 million a month or something. I believe as far as having its order done, at some point, if the defendants did not make the payment according to the schedule, that our office, through our financial litigation section, would seek specific means to get the payment done. But ultimately, what the district court has the right to do is say that, you know, the money should be paid to customs. And, of course, in this case, there are very valuable assets. And, therefore, there are. Again, I can't. I don't recall. What are those assets? The buildings themselves? The buildings themselves and then most particularly the buildings themselves, but then to the extent that they're being rented out and there's the income coming in from the rental. You know, all of that is assets to each of the defendants and, therefore, ultimately is available to pay restitution up to the amount that's set. What about the other aluminum inventory? Was that maybe I misconstrued the record, but was that also something that the government was putting into the mix as subject to restitution? It was, Your Honor, and that was in regard to the perfectus defendants and that is not a matter that we have appealed. What happened to those, just as an aside? Some were subject to a forfeiture order and some were re-exported to Vietnam as part of the ongoing fraud and sort of Ponzi scheme of this fraud infrastructure. So then before us is mainly the issue of the value of the warehouses. Any potential income? That is correct, Your Honors. And I understand there was a dispute as to that value between probation and the government's filings? Yes, Your Honor. We took a market view and think that the four of them are close to a billion dollars probation and the probation office was very candid about this. They took a more formal view and looked at the tax assessment, which, of course, was still vastly more than a nominal amount, but was more around 100 collectively. It was about $161 million. But doesn't the court have the right to determine not to require liquidation of the warehouses? Your Honor, again, it has the right not to require that, but it needs to take into account the value of the assets of the defendants and needs to come up with a restitution number that reflects the value of the assets. And if in the real world that means the only way the defendants can satisfy their judgment is to liquidate their assets, then, yes, the mandatory nature of the MVRA would require them to take the steps that are necessary, which in the real world could, and in this case could well be, that they have to sell the warehouses. Then I think you're arguing that the court had to order liquidation because it couldn't be paid otherwise, and it doesn't matter how much the warehouses were worth. They have to be liquidated. That's really, practically speaking, the only source of repayment except potentially income that they make. Again, Your Honor, that is probably correct based on what we have in the record. But to be precise, I don't believe that it has to order a liquidation. It has to, based on the value of the assets, it needs to say in some reasonable time period you need to pay the government the value of these and how you do it is up to you realizing that selling them is going to be the most logical and effective way to get the money to pay customs. And again, we've dealt with the other issues and said there was no issue as to the amount of the restitution, and I'll just emphasize then that even while the restitution issues were hotly contested, the idea of a nominal payment schedule was never really raised prior to this coming out at the end of the sentencing hearing. In fact, even the defendants argued was, for example, at 3 ER 452, they asked for a reasonable payment schedule. At 3 ER 584 and 85, they said that they asked for a reasonable and periodic payment plan, but in that argument until the district court came up with its ruling, there was no discussion and certainly not in the PSRs of a nominal payment plan where, again, they would have 375,000 years to make the necessary payments. And there's no other questions from the court on the restitution? No other questions. Thank you. Your Honors, if I may start with the last point first. The payment schedule was actually in the PSR. The PSR at paragraphs 80 and 81 in each of the PSRs indicated probation, the probation office recommended that the district court should either order restitution paid within 90 days, which is in effect liquidation and pay right now, or set a nominal payment schedule of 10% of gross revenue but not less than $100 per month. The government did not object to that. The government argued about the value, assuming, I guess, hoping that the court would take the first of the two options, but the government certainly didn't object to the second of the two options. It is well within the court's discretion to decide not to order immediate payment. Was there evidence that the warehouses were in operation? Yes, Your Honor. And that there's income? No, Your Honor. There is a management company that controls the use of the warehouses and the revenue. The warehouses indicated and the PSRs reflected that there was no income. There was no expenses and there were no incomes. Has anything been paid? Yes, Your Honor. How much? $100 a month per defendant every single month in a timely fashion in compliance with the court's order. And can the government go back and ask that the restitution order be paid in light of the fact that only minimal payments have been made? If the government believes that there's a violation of the court order, which is 10% of the gross revenue or $100, whichever is greater, the government can go back and ask. That's not what I mean. Does the court have the ability to modify the restitution order in light of the fact that nothing but nominal payments have been made? The court has the ability if there's a showing of a change in revenue, Your Honor. And the court considered the revenue at the time of sentencing. If the government has evidence or if the defendants have a change in revenue, then probation can initiate that change, so could the government, so could the defendants. How is the government supposed to find out that there's a change in revenue? Probation takes the lead in monitoring the money coming in and coming out, and probation is entitled to look at all of the books, look at all the records, have a monthly check-in or more with the defendants should they want them. And so there is transparency in terms of the economics of all of those LSCs. The problem here is we— regarding the operation of the warehouses? I believe that it's a standard condition of probation and supervised release that the defendant should work with the probation officer. And should the probation officer believe that the defendants are not being transparent and honest, then that would, of course, go back before the court. Is the revenue solely from—where is the revenue coming from? Income from the warehouse rentals or— That would be where the revenue would come from in terms of the physical space. To be frank, these warehouse defendants are entities that are single-purpose entities. All they do are hold title to the warehouse. They do not operate the warehouses. They do not oversee the warehouses. That is another company that has a management company. The government could have, should the government decided to, could have charged the management company. The management company is not a defendant in this case. The management company is outside the purview of this case. The government charged whom the government believed they should charge, and in doing so, these warehouse entities, the court and probation and the government should all be looking at the revenue coming in, the amount of money coming in. That is fair game. And the court looked at that, probation looked at that, and probation determined that the revenue generated at the time of sentencing was $0 of gross monthly income. That is what probation's report said. The government did not object to it. The government did not say that is not right. The government did not say we want to have an evidentiary hearing for them to prove it up. It went uncontested, and under those circumstances, it made sense for the court to accept that as the revenue coming in because it was not, it wasn't put at issue by the government at the time of sentencing. If the government didn't believe that to be true, so be it. The government could have asked for an evidentiary hearing. Instead, the government affirmatively objected to an evidentiary hearing because, for whatever reason, I don't want to speculate, but they objected to an evidentiary hearing, didn't object to those paragraphs in the PSRs, and accepted those numbers. Now the government comes to this court and says, because of the large amount of money that is due, that the court's discretion should be changed somehow, that it's an abuse of discretion for the court to set a payment order, whatever the payment order is. That isn't correct. There are many cases before this court where there are very high restitution orders that the defendants never are able to pay. It does not mean that under those circumstances, take it in an individual defendant's circumstance. That does not mean, because there's a high restitution number, that the court should say, you know what, you need to sell your house, you need to sell your car, you need to sell your clothing, you need to sell your wedding ring, you need to liquidate Owen 100% in order to make the restitution order under the Mandatory Restitution Act. That is not the state of the law. But if the person maybe has a second house in Santa Barbara and a yacht and other things, doesn't the court have to take that into consideration as to their ability to pay? Of course. I mean, I think that's the government's contention, right? It's that defendants are sitting on a pile of assets that are far larger than what the court contemplated. And I think it was objecting to that aspect of it, maybe not the revenue stream, right? Yes, Your Honor. But whether or not in total those warehouses are worth $200 million, $500 million, $1 billion, any of those numbers are substantial numbers. And the court knew that, even taking a conservative figure, the court knew of those assets, and the court made the determination not to order, in effect, immediate liquidation. That was within the court's discretion. This is different than a second home because that implies a first home. These warehouse LLCs, they have one asset each, one warehouse each. If that's ordered liquidated, in effect, those LLCs are gone. I thought over, you know, if a restitution order is not paid within a certain number of years, I forget what it is. I remember one of the district court days that if the defendant did not make restitution, ultimately there comes a certain point at which the government can reduce the restitution order to a civil judgment. Isn't that right? That is correct. And then they can use all the tools, the civil process. That is correct. They could force a sale. They could do anything to collect the restitution. They can avail themselves of whatever is available under the law in terms of litigating that on the civil side. That is correct. It becomes a judgment. Whether or not down the road that is ordered an immediate liquidation, that's a question for litigation in that scenario. It's executing on a judgment in the civil realm like any judgment. That is correct. But during the period of probation, it is within the trial court's discretion to set the payment schedule regardless of the total. I know the government puts in a big number. It's going to take 375,000 years for this to get paid. I get that. That has some kind of, you know, immediate appeal to it. But that's not really the question before this court. The question before this court is whether or not the court, in having all of the information about the assets, about the revenue coming in, about the expenses going out, having all that information, it being briefed in multiple rounds of briefing, whether it was within the court's discretion to order what the court ordered. And it was within the court's discretion. The court knew that at that rate. You're repeating yourself. I think we've taken you over, but thank you. If you want to give a concluding statement, you may. The one thing that I wanted to point out before the restitution issue was raised, the court was asking whether there were specific questions about Chinese nationals and prejudicial feelings about China or Chinese nationals and whether that was requested specifically. It was requested. That's at 5 ER 995 to 998. We had multiple questions specifically on Chinese nationals, on China, on COVID, whether there was any prejudicial feeling. I think he was making the point that you never asked for that. You put it in your submission along with countless other questions. Did you ever raise that specifically with the judge other than to put it in your written submission? Yes, Your Honor. We went sidebar and said we had additional questions. The court cut us off and said to the extent that the court was going to ask any of those questions, the court has. And basically move on with all due respect. We raised it. We put it in writing before the court. The court had it. We went sidebar. We reiterated it. And so, yes, we did not wait. I want to make sure I'm understanding you. You're saying at sidebar, and it is in the record, you specifically asked for these questions to be submitted? At sidebar, we requested that the court consider the additional questions that we submitted. That's not what I'm asking you. Did you refer to these specific questions? No, Your Honor. We did not. And if I may just... Counsel, I think we should wrap this up. Okay. Thank you, Your Honor. Thank you. The matter will stand submitted. Thank you, counsel, for your arguments. And court is adjourned. All rise. This court for this session stands adjourned.
judges: PAEZ, SANCHEZ, Lynn